Heatley Green v. Commissioner. Charles F. Whitman v. Commissioner.
Green v. Commissioner
Docket Nos. 109529, 109530.
United States Tax Court
1942 Tax Ct. Memo LEXIS 16; 1 T.C.M. (CCH) 297; T.C.M. (RIA) 42679; 12/23/1942
*16 John C. Evans, Esq., 2036 Union Guardian Bldg., Detroit, Mich., and George L. Cassidy, Esq., 2036 Union Guardian Bldg., Detroit, Mich., for the petitioner. Melvin S. Huffaker, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: These proceedings involve the following deficiencies in income tax for the calendar year 1939: Docket No.
Taxpayer
Deficiency
Overpayment Claimed
109529
Heatley Green
$19,768.07
$2,887.76
109530
Charles F. Whitman
472.69
100.09
These were submitted upon a stipulation of facts, supplemented by the testimony of Green. The stipulated facts are found accordingly. Other facts set out in the findings are based upon the testimony. Findings of Fact Petitioners, residing in Michigan, filed their income tax returns for the taxable year with the collector of internal revenue for the district of Michigan. They owned all of the capital stock of Automatic Products Company (hereinafter referred to as the old company) which had been organized under the laws of the State of Michigan on May 7, 1913. The outstanding stock of this corporation and its ownership by petitioners from November 8, 1927, to and including *17 all times material herein, are as shown by the following schedule: Taxpayer
Class A
Class B
Heatley Green
20,880
11,600
Charles F. Whitman
2,160
1,200
Total outstanding
23,040
12,800
Petitioners were of rather advanced years and wished "to get out" of the manufacturing business. On December 22, 1939, a special meeting of the stockholders of the old company was held for the purpose of considering a proposed "Plan of Reorganization." The general purposes of the plan, as stated therein, were: (1) to relieve the manufacturing operation from the overhead expense of carrying non-productive property and property which was not readily salable; (2) to relieve the real estate owned by the old company and its excess working capital from the hazards of a manufacturing business; (3) to place the manufacturing operation in a position of greater flexibility; and (4) to render the stock of the manufacturing company more attractive to possible investors. The proposed plan provided that the name of the old company should be changed to Automatic Manufacturing Company; that two new corporations, the Bangor Investment Company (hereinafter referred to as Bangor) and the Automatic Products *18 Company (hereinafter referred to as the new company) should be created; that the real property and buildings of the old company should be transferred to Bangor and that its manufacturing assets should be transferred to the new company; that in exchange for these transfers the new corporations should issue their capital stock direct to the stockholders of the old company; and that these stockholders should surrender to the old company 41.28 per cent of their old company stock in exchange for the Bangor stock, and 31.32 per cent of their stock in the old company in exchange for the new company stock. At the meeting of December 22, 1939, the stockholders of the old company approved and adopted the proposed "Plan of Reorganization" and ordered that it be carried into effect. At the same meeting the stockholders also resolved that, from and after the completion of the Plan of Reorganization "to the point" of effecting the transfers of property called for therein, the old company should discontinue all active business, assume a liquidating status, and proceed promptly to wind up and close its affairs and immediately distribute its remaining assets in complete liquidation. It was further *19 resolved that the articles of incorporation be amended to read: "The term of existence of this corporation shall expire December 30, 1939." The charter of the old company would have expired on May 7, 1943. The old company changed its name to the Automatic Manufacturing Company on December 27, 1939. The stock ownership remained the same and no change in the officers or directors was made on that date. On December 29, 1939, Bangor and the new corporation were formed. Petitioners were the incorporators. On December 28, 1939, pursuant to resolutions passed at a special meeting of the board of directors of the old company [1] the forms of conveyance of the property to Bangor and the new company were approved and the officers were directed to execute them in the name of the corporation. The directors ratified and approved the action taken by the stockholders at the meeting of December 22, 1939, and passed the following resolution: * * * that the property and assets of this corporation remaining after the completion of the Plan of Reorganization of this company to the point effecting the transfers of property called for by the Plan shall be distributed pro rata among the stockholders of *20 this company as a dividend in complete and final liquidation of this corporation, said dividend to be in full payment in exchange for all of the then remaining outstanding capital stock of this corporation, which stock shall be immediately surrendered for cancellation. The directors also resolved that certain designated property be distributed to petitioners, they having expressed a desire to have the property transferred to them as their pro rata shares of the liquidating dividend. The authorized common capital stock of Bangor was 1,400 shares of a par value of $100 per share. It commenced business with paid in capital of $136,533.10, which was paid in by the old company. The old company assigned to it all of its real estate, buildings, boilers and sprinklers in exchange for 1,365 shares of its stock, the shares being issued directly to petitioners, 1,237 to Green and 128 to Whitman. They surrendered *21 to the old company for cancellation 41.28 per cent of their stock in that company. No other stock was issued by Bangor. Upon its formation the new company had 1,250 shares of authorized common capital stock of $100 par value each. It commenced business with a paid in capital of $103,623.61, which was paid in by the old company. The old company assigned to the new company all of its personal property except municipal bonds, United States Government bonds, notes receivable and a claim against a bank, in exchange for 1,036 shares of its common capital stock, the stock being issued directly to petitioners, 939 to Green and 97 to Whitman. They surrendered to the old company for cancellation 31.32 per cent of their stock in that company. No other stock was issued by the new company. The old company distributed its remaining assets, having a fair market value of $102,579.68, to petitioners, who, upon receipt thereof, surrendered for cancellation their remaining stock in the old company. The amount of stock surrendered was 27.40 per cent of the total stock which they owned in the old company prior to its reorganization (100 per cent less 41.28 and 31.32 per cent). The assets distributed *22 to Green were: U.S. Treasury bonds - mkt.
value 12/30/39
$ 7,721.88
Municipal bonds - mkt. value
12/30/39
73,807.59
Accrued interest on bonds -
mkt. value 12/30/39
952.18
Impounded bank funds -
First Nat'l Bank, Detroit
8,203.99
Notes receivable (3,000 less
722.81 cash paid)
2,277.19
Total
$92,962.83
The assets distributed to Whitman were: 80 U.S. Bonds - market value
110 10/32
$ 8,825.00
Accrued interest on bonds to
12/30/39
69.04
Cash
722.81
Total
$ 9,616.85
The old company ceased to exist and all of its assets had been fully distributed on December 30, 1939, the date of the expiration of its corporate term as fixed by the resolution of December 22, 1939. The stock of Bangor and the stock of the new company, transferred to petitioners as above set out, and the amounts received by petitioners upon distribution of the remaining assets of the old company were in exact proportion to their respective stock ownership in the old company. In their returns of income for the taxable year petitioners treated the transfers to Bangor and to the new company as non-taxable reorganizations. They treated the liquidation of the old company as an exchange of stock in *23 complete liquidation of 27.40 per cent of their stock in the old company and reported the gain as long term capital gain. [2] The Commissioner eliminated the amount reported as long term capital gain and held that the distributions were taxable as dividends. Accumulated net earnings and profits of the old company were more than sufficient to have paid a dividend in the amount of $102,579.68, the aggregate of the cash and assets distributed to the petitioners. The statutory cost basis of the stock surrendered for cancellation by Green was $23,062.68 and of the stock surrendered by Whitman was $2,376.26. Opinion The parties agree that the transfers contemplated by the plan of a part of the assets of the old company to Bangor and to the new company in exchange for capital stock of these two corporations, were statutory reorganizations as *24 defined in section 112 (g) (1) (C) of the Revenue Act of 1938. They also agree that petitioners' exchanges of stock of the old company for stock of Bangor and the new company were within the nonrecognition of gain or loss provisions of section 112 (b) (3) of the same act. They differ, however, as to the treatment to be accorded the distribution by the old company to petitioners of its liquid assets, having a value of $102,579.68. The pertinent provisions of the Revenue Act of 1938 are set out in the margin. [3]
*25 Petitioners contend that the old company first consummated a plan of reorganization, and, after the reorganization was completed, declared a liquidating dividend of all of its assets in redemption of its then outstanding capital stock; that the reorganization and dividend distribution were separate and distinct transactions; that the dividend distributions fell within the provisions of section 115 (c), supra; and that any profit resulting therefrom constituted either a short-term or long-term capital gain under section 117 of the Revenue Act of 1938. In the alternative, petitioners urge that if the distribution was not in fact in complete or partial liquidation of the old company but was an integral part of the plan of reorganization, then the assets, cash and property which were received by petitioners constituted other property within the provisions of section 112 (c) (1) rather than 112 (c) (2) of the Revenue Act of 1938, supra. Respondent contends that the transfer by the old company of portions of its assets to Bangor and the new company in exchange for stock, and the transfer of this stock and the remaining assets of the old company to petitioners, in exchange for *26 their stock in the old company, were "made pursuant to one unitary plan of reorganization" and were component and integral parts of one transaction. He also contends that the distribution to petitioners of other property having a value of $102,579.68 had the effect of the distribution of a taxable dividend, and was taxable to them as an ordinary dividend under the provisions of section 112 (c) (2), supra. From the testimony of petitioner Green, sole witness for petitioners, it appears that the transfers and distributions here involved had their inception in the desire of petitioners "to get out" of the manufacturing business and possibly sell some stock in the new corporation to young men, who would continue to carry on the business previously conducted. One of the petitioners was 61 years of age and the other 67. When Green's testimony is considered in conjunction with other evidence in the record it becomes quite apparent that petitioners considered their chances of interesting investors in the business would be enhanced if two new corporations were formed, one of which was to receive the real estate of the old company and the other the manufacturing assets, the capital of *27 each to be confined to the actual needs of the business. A proposed plan of reorganization was drafted providing for the creation of two new corporations and the transfer to one of the real estate and to the other of the manufacturing assets, in exchange for stock to be distributed to petitioners. No mention was made therein of the disposition to be made of liquid assets having a value of $102,579.18, which were not included in the transfers. The plan as drafted was submitted to a special meeting of the stockholders held on December 22, 1939, and a resolution that it be adopted was approved by the stockholders. At the same meeting the stockholders also approved and adopted another resolution providing that from and after the completion of the Plan of Reorganization "to the point" of effecting the transfers to the new companies, the old company should discontinue all active business, assume a liquidating statute, and immediately distribute its remaining assets in complete liquidation. At a meeting of the board of directors held on December 28, 1939, the acts of the stockholders were ratified and approved and a liquidating dividend was declared of the liquid assets remaining after *28 the completion of the "Plan of Reorganization." The transfers of a part of the assets to each of the two new corporations, and the remainder to petitioners, took place thereafter and prior to December 30, 1939. The old company ceased to exist on the latter date. It is quite obvious from this brief recital of the facts that petitioners' contention that the old company "first, consummated a plan of reorganization * * * and, second, after the reorganization was completed declared a liquidating dividend of all of its assets in redemption of its then outstanding capital stock is not supported by the evidence. The "liquidating dividend" was declared at the meeting held on December 28th in which the board of directors approved the action taken by the stockholders on December 22nd in approving the plan to create the two new companies and transfer to them a part of the assets of the old company. The parties have stipulated that the new corporations were not formed until December 29, 1939. The transfers to the new corporations and the distributions to petitioners must, therefore, have been made either on December 29th or December 30th, as the old company was dissolved on the latter date. *29 The courts have held, repeatedly, that for income tax purposes, the component steps of a single transaction cannot be treated separately. ; certiorari denied, , affirming ; ; , affirming on this point, ; ; certiorari denied, ; , affirming , on this point; and where transfers are made pursuant to a plan of reorganization, they are ordinarily treated as parts of one transaction. . Petitioners concede that the transfer of part of the old company's assets to the new corporations *30 and the distribution of the stock of the new corporations were parts of the plan of reorganization. They argue, however, that the distribution of the remaining liquid assets was not essential to the plan of reorganization, that they could have had the old company hold the liquid assets until its charter expired in 1943 had they chosen to do so, and that this distribution was a separate and distinct transaction. The fact that petitioners could have postponed the distribution of the liquid assets does not justify the exclusion of that distribution from the plan of reorganization. The statutory reorganization would have been complete if the old company had merely transferred a part of its assets to the new corporations in exchange for their stock, which could have been retained by it until 1943. But petitioners, as stockholders and directors, desired that other steps be taken, viz., that the stock of the newly organized corporations and the liquid assets of the old be distributed to them. According to the testimony of petitioner Green, the plan "was to create the [new companies] and liquidate the old." The fact that the distribution of the remaining liquid assets of the old company *31 was not included in the document denominated the "Plan of Reorganization" is not determinative. A plan of reorganization need not be included in a single document. Cf. , affirming ; certiorari denied, ; , affirmed per curiam June 19, 1942; ; . At the same meetings in which petitioners, as stockholders and directors, approved the creation of the two new corporations, the transfer to them of part of the old company's assets in exchange for stock, and the distribution of the stock to themselves, they also approved the distribution of the remaining liquid assets. The transfers and distributions were to be made, and were made, simultaneously. These facts clearly indicate that all of the steps taken were part of the single plan of reorganization and that the plan required the complete liquidation of the old company. It follows, therefore, *32 that the distribution of the liquid assets to petitioners was made pursuant to the plan of reorganization. Prior to the reorganization petitioners owned all of the stock of the old company which had earnings and profits accumulated after February 28, 1913, in excess of $102,579.68. After the reorganization they no longer owned stock of the old company but had in lieu thereof stock of the new company and the liquid assets. The substance of the transaction was that they exchanged stock for stock and other property pursuant to a plan of reorganization. Inasmuch as the other property received represented earnings and profits of the old company accumulated after February 28, 1913, this distribution had the effect of a taxable dividend and the pro rate share received by each of the petitioners was taxable as a dividend under the provisions of section 112 (c) (2), supra. The conclusion reached finds support in , affd., (C.C.A. 3) . The facts of that proceeding do not differ in any material respect from those here involved. In that case, a new corporation was organized on April 7, 1927, *33 to take over the assets except cash of the Bessemer Company. A dividend of $1,150,157.95 in partial liquidation of the Bessemer Company (payable on or before June 14) was declared on June 7, 1927, and on the same date the directors of the Bessemer Company adopted a resolution calling upon the stockholders to approve the transfer to the new corporation as of June 15, of the remaining assets in exchange for stock of the new corporation which was to be distributed directly to the stockholders of the Bessemer Company. On June 15 the stockholders approved the transfer and it was executed, and on the same date the directors authorized the officers of the Bessemer Company to take steps to dissolve it. The Board and the Circuit Court of Appeals for the Third Circuit held that the Bessemer Company was liquidated in pursuance of the plan of reorganization; that the cash and stock received by the stockholders of the Bessemer Company were in full payment and exchange for their Bessemer Company stock; that the gain realized by them, to the extent of the cash received, was taxable under section 203 (d) (1) of the Revenue Act of 1926 (same as section 112 (c) (1) of the 1938 Act); and that the cash *34 received by the stockholders was taxable as an ordinary dividend to the extent that it represented earnings and profits of the Bessemer Company accumulated subsequent to February 28, 1913. In its opinion, the Circuit Court, among other things, said: We are of the opinion that the transactions must be considered as a whole and constitute a reorganization whereby the Bessemer Company transferred its assets, with the exception of cash, to the Bessemer Corporation in exchange for the stock of that company. The so-called liquidating dividend was but a step, albeit an essential one, in the reorganization. Even if we deem the cash distributed by the Bessemer Company to be not an essential part of the reorganization, none the less we entertain no doubt that it was distributed in pursuance of that general plan which was approved by all the corporations and all their stockholders. It is clear that Bessemer Corporation was formed for the specific purpose of acquiring the assets of the Bessemer Company, Harmar and Indianola, for resolutions of the Board of Directors of Bessemer Corporation were passed in which this very fact was recited, and the president of Bessemer Corporation so stated to *35 its directors. That a well-designed plan to effect reorganization of the companies was in contemplation and was carried out is demonstrated also by the fact that the directors of Bessemer Company and Bessemer Corporation held their respective meetings to effect the transfer of assets from one corporation to another within a period of a few hours of each other and approved a formal agreement which must have been some time in preparation. We conclude therefore that all of that which took place was in fact a continuous and single transaction and must be considered to be such. , certiorari denied, ; ; . Petitioners cite and rely principally upon , and . In each of these cases a new corporation *36 had been formed to acquire all of the assets of an old company, except cash or other liquid assets. Pursuant to plan, the assets were transferred to the new corporation in exchange for stock, which the new corporation distributed directly to the stockholders of the old company without surrender of their old shares. The plan in each instance provided that the old company should be dissolved. In both cases the distributions in liquidation were consummated approximately a month after the transfers to the new corporation. The Board held that there was no exchange of stock for stock, pursuant to a plan of reorganization, and that section 112 (b) (3) was not applicable; that the transfer to the new corporation and distribution of stock to the old stockholders fell within the provisions of section 112 (g); and that the distribution in liquidation was a separate transaction and taxable under the provisions of section 115 (c). The cited cases are distinguishable upon the facts from the instant proceedings. In each, while the plan contemplated the dissolution of the old corporations, no provision as to the time of dissolution was set out and the distributions in liquidation did not occur until *37 approximately a month after the transfers to the new corporations. The plans did not provide, as in the instant proceedings, for the immediate distribution of the remaining assets in complete liquidation. Another distinction is that in the cited cases the old company's stockholders received stock of the new corporation without surrendering any of their stock in the old company. It was held that section 112 (b) (3) was not applicable because there was no exchange of stock for stock, and that section 112 (c) (2) could not be applied since it was limited to certain cases coming within the provisions of section 112 (c) (1). As was stated in the Boehringer case: "section 112 (c) (1) deals only with exchanges which would be within the provisions of subsection (b) (1), (2), (3), or (5) if it were not for the fact that the property received in exchange consists not only of property to be received without the recognition of gain, but also of other property or money." While none of the above subdivisions of subsection (b) applied in the cited cases, the petitioners in the instant proceedings did make an exchange of stock for stock within the provisions of section 112 (b) (3). Another *38 factor, which may have had some bearing upon the conclusion reached, was the language of section 112 (g). This section provided that if, in pursuance of a plan of reorganization, there was distributed to a shareholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the distributee from the receipt of such stock or securities should be recognized. It was held in each of the cited cases that the transaction therein involved, with the exception of the distribution in liquidation, fell within the provisions of section 112 (g). Section 112 (g) was omitted from the Revenue Act of 1934 and subsequent revenue acts. The reason given for its omission was that under it corporations had "found it possible to pay what would otherwise be taxable dividends, without any taxes upon their shareholders." H.R. Report No. 704, 73rd Congress, Second Session. Since the section is not contained in the revenue act applicable here we need give it no consideration. It may be pointed out, however, that petitioners did *39 surrender all of their stock in the old corporation either on December 29th or December 30th. As indicated above we think it must be held, following , that, pursuant to a plan of reorganization, petitioners exchanged stock of the old company for stock of the new corporations, and "other property or money"; that any gain resulting from the exchange of stock for stock was not to be recognized for tax purposes as provided in section 112 (b) (3), supra; and that, inasmuch as the "other property or money" received by petitioners represented earnings and profits of the old company accumulated after February 28, 1913, its distribution had "the effect of the distribution of a taxable dividend". Under the provisions of section 112 (c) (2) the ratable shares of the liquid assets distributed to petitioners were correctly treated by the respondent as taxable dividends. The deficiencies, therefore, must be, and they are, approved. Judgment will be entered for the respondent. Footnotes
1. The stipulation states that the resolutions were passed at a special meeting held on December 18, 1938. This appears to be erroneous; for the photostatic copy of the resolution attached to the stipulation shows that the meeting was held "on Thursday, the 28th day of December, 1939."↩
2. Green computed his capital gain as follows: ↩
Assets received upon surrender of 8.899.52 shares of capital stock of old
company (27.40 per cent of 32480 shares)
$92,962.8
Less cost basis of 8,899.52 shares at $2.5937 per share
23,082.6
Gain Realized
$69,880.1
Taxable Gain (50%)
34,940.0
A similar computation was made by Whitman
3. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. (b) Exchanges Solely in Kind. - * * *
(3) Stock For Stock on Reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization, are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * *
(c) Gain From Exchanges Not Solely in Kind. - (1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of each money and the fair market value of such other property. (2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property. * * *
(g) Definition of Reorganization. - As used in this section * * * (1) The term "reorganization" means * * * (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, * * * SEC. 115. DISTRIBUTION BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property. (1) out of its earnings or profits accumulated after February 28, 1913. * * * (b) Source of Distributions. - For the purpose of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * * (c) Distributions in Liquidation. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite thered as a short-term capital gain, provisions of section 117, the gain so recognized shall be conside except in the case of amounts distributed in complete liquidation. * * * SEC. 117. CAPTAL GAINS AND LOSSES. * * *
(b) In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income.↩